Civil No. 09-2432 (JNE/FLN)

Jason Joseph Slavicek,

        Plaintiff

    v.                          **REPORT AND
RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant

_____

Bart B. Torvik and Peter W. Carter, Esqs., for Plaintiff
Lonnie F. Bryan, Assistant United States Attorney, for Defendant

_____

Plaintiff Jason Slavicek seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied his application for disability insurance benefits ("DIB"). The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g). The parties submitted cross-motions for summary judgment. (Doc. Nos. 11, 19.) For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be **DENIED**, and Defendant's motion for summary judgment be **GRANTED**.

# I.   INTRODUCTION

Plaintiff filed an application for DIB on July 6, 2006.  (Doc. No. 10,  Administrative Record [hereinafter "Tr."] at 133-35).  He initially alleged an onset of disability of October 14, 2005, but later amended the onset date to September 1, 2006.  (Tr. 133, 40.)  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 100-04, 108-110.)  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on August 13, 2008.  (Tr. 111, 37-93.)  On November 25, 2008, the ALJ issued a decision denying Plaintiff's claims.  (Tr. 19-36.)  The Appeals Council denied Plaintiff's request for review on July 4, 2009 (Tr. 1-4), making the ALJ's decision final for purposes of judicial review.  *See* 20 C.F.R. § 404.981.  Plaintiff commenced this action seeking judicial review of the Commissioner's decision on September 9, 2009.

# II.   STATEMENT OF FACTS

Plaintiff alleges disability from the following impairments: neck pain, headaches, lower back pain, radiating pain into the legs, and depression.  (Tr. 155, 192.)  Plaintiff was 37-years-old on the amended onset date of September 1, 2006.  (Tr. 133.)  He has a high school diploma and began college courses in 2008.  (Tr. 160, 649.)  His prior employment included truck driver, bar manager, customer service representative, property manager, and maintenance mechanic.  (Tr. 87-88, 226-27.)  Plaintiff last worked in October 2005.  (Tr. 155.)

## A.   <u>THE MEDICAL RECORD</u>

The first medical record is of Plaintiff's visit to Chiropractor Christopher D. Wood on July 1, 2005.  (Tr. 231-32.)  Plaintiff complained of low back pain with associated left thigh numbness.  (Tr. 231.)  He suffered an injury on June 23, 2005, while reaching for a trailer door.

(Id.)  His pain was worse the next day and was exacerbated by coughing, sneezing, and

movement.  (Id.)  Plaintiff rated his pain as four or five on a scale of one to ten.  (Id.)  He was

sleeping poorly.  (Id.)  He also had a past whiplash injury from an automobile accident four or

five years earlier, with continuing headaches and neck pain, which he treated with Naproxen.

(Id.)

On examination, Plaintiff exhibited significant decreased active range of motion in the

thoracolumbar spine.  (Id.)  Other findings included positive straight leg test bilaterally; positive

Minor's sign, difficulty getting up from a seated position; and positive Valsalva's test.  (Id.)  Dr.

Wood diagnosed lumbar subluxation with associated sprain-strain of the lower back and left

anterior thigh radiculopathy.  (Id.)  Plaintiff was treated with chiropractic adjustments through

October 2005.  (Tr. 232-43)

In October, after Plaintiff's MRI showed disc bulge at L4 and L5, Dr. Wood noted

Plaintiff would begin physical therapy, and then return for chiropractic care.  (Tr. 242.)  On

October 26, 2005, Plaintiff reported to Dr. Wood that physical therapy was helping some but

occasionally made it difficult for him to walk, so he used a cane.  (Id.)

Plaintiff had a lumbar epidural injection at Gunderson Clinic on January 9, 2006.  (Tr.

270.)  As an addendum to his report on this procedure, Dr. Evan R. Nelson stated:

> He has had an x-ray that is unremarkable of his lumbosacral spine
> on September 20, 2005.  I did review the MRI radiologist's
> reading.  The MRI was September 29, 2005.  It does show some
> degenerative disc disease at L4-5 and L5-S1.  There is also a
> broad-based disc bulge contacting the L5 nerve root.  Also, at the
> L5-S1 level, there is an L5-S1 disc protrusion displacing the left
> S1 nerve root.  He also has mild facet hypertrophy at L4-5 and L5-
> S1.

(Tr. 271.)  On January 24, 2006, Plaintiff had a second lumbar epidural injection, although the first injection had not provided significant relief.  (Tr. 269.)

The next month, Plaintiff underwent an independent medical evaluation at the request of Sentry Insurance Company, presumably in relation to his workers compensation claim.  (Tr. 338-48.)  Dr. Paul Liebert, an orthopedic surgeon, performed the evaluation.  (Tr. 348.)

Dr. Liebert noted Plaintiff was 36-years-old on the date of the injury, June 23, 2005.  (Tr. 339.)  Plaintiff reported he was reaching for a trailer door, twisted at the waist, and felt a sharp pain in his lower back.  (Id.)  The pain worsened over the next few hours.  (Id.)  Plaintiff began chiropractic treatment within a week of the injury, which continued through October 2005.  (Tr. 340.)  In September, Dr. Wood referred Plaintiff to Dr. Showalter who ordered an MRI and started Plaintiff in physical therapy.  (Id.)  When Dr. Showalter left the practice, Dr. Quinn took over, and started Plaintiff in a work hardening program.  (Id.)  On February 14, 2006, Dr. Quinn referred Plaintiff to a neurosurgeon, Dr. Mark Stevens.  (Id.)  Plaintiff had two epidural injections, which were of no help.  (Id.)  Dr. Quinn then prescribed hydrocodone.  (Id.)

Dr. Liebert summarized Plaintiff's pain profile.  (Tr. 342.)  Plaintiff reported ongoing mild low back pain associated with a burning sensation in his left leg.  (Id.)  Plaintiff had difficulty lifting his left leg due to perceived weakness.  (Id.)  His back and leg pain increased with sitting for any length of time, and with bending, squatting or crawling.  (Id.)  Plaintiff drove ninety minutes to see Dr. Liebert, and the driving aggravated his low back pain.  (Id.)

On examination, Plaintiff was able to move about the room slowly and deliberately without abnormality or difficulty.  (Tr. 345.)  Plaintiff could forward bend, side bend and twist.  (Tr. 346.)  There was no palpable spasm during range of motion exercises.  (Id.)  Sitting and

supine root tests did not reproduce any radicular symptoms. (Id.) There was no measurable thigh or calf atrophy in the lower extremities. (Id.) Reflexes and sensation were intact. (Id.) Plaintiff's gait was normal. (Id.) Dr. Liebert concluded Plaintiff sustained strictly a soft tissue injury, although he had pre-existing underlying degenerative disk disease and facet arthritis. (Tr. 346-47.) Dr. Liebert opined that one would expect Plaintiff to need treatment for his injury for four to six months because of his underlying arthritis. (Tr. 347.) Dr. Liebert opined Plaintiff could have returned to work on December 23, 2005. (Id.)

Plaintiff underwent a discogram at L3-4, L4-5, and L5-S1 on May 10, 2006. (Tr. 268). The discography did not reproduce Plaintiff's symptoms. (Tr. 268-69.)

On July 24, 2006, Plaintiff underwent a psychological evaluation with Dr. James Hobart to assess his emotional difficulties from chronic pain syndrome. (Tr. 294-95.) Plaintiff reported that he lived with his wife, 5-year-old son, and 10-year-old step-daughter. (Id.) He finished high school and then attended a year long program in heating and air conditioning. (Id.) His most recent work was as a long-haul truck driver for twelve years, which ended in October 2005. (Id.)

Plaintiff reported a history of alcohol and drug abuse in the late 1990s, using cocaine to help him stay awake and work long hours. (Id.) After going through a treatment program, he leased a bar and continued to abuse alcohol and drugs. (Id.) He told Dr. Hobart that he was no longer using and was not abusing his prescription medications. (Id.)

Plaintiff reported that his most recent injury was from twisting the wrong way when he closed a trailer door. (Id.) During a work hardening program, he believed that he pinched a nerve. (Id.) Plaintiff complained about providers chastising him for missing appointments when he was sick, and providers who belittled him by saying he could perform tasks he could not

perform.  (Id.)  Functionally, Plaintiff said he could take care of his personal needs but with pain.  (Id.)  He used to enjoy yard work but could no longer do it.  (Id.)

On mental status examination, Plaintiff was alert and oriented.  (Id.) He was pleasant, and his affect was appropriate and mood euthymic.  (Tr. 294.)  He described himself as irritable with his wife and children.  (Id.) He was taking Trazodone for sleep disturbance.  (Tr. 295.)

Dr. Hobart administered a number of tests including the Pain Belief and Perceptions Inventory; the Pain Patient Profile, and the Millon Clinical Multiaxial Inventory-III.  (Tr. 294.)  Based on the clinical interview and test results, Dr. Hobart diagnosed pain disorder associated with psychological and medical condition, adjustment disorder with depressed mood, narcissistic and antisocial personality traits, and a GAF score of 55.[1]  (Tr. 295.)  Dr. Hobart recommended counseling and a chemical dependency evaluation.  (Id.)

Plaintiff saw Dr. Jason Weindorfer at Franciscan Skemp Healthcare on July 26, 2006.  (Tr. 289.)  Plaintiff's chief complaint was GERD (gastroesaphogeal reflux disease), which he had for four or five years.  (Id.)  Dr. Weindorfer prescribed Protonix for reflux.  (Id.)  Plaintiff also complained of neck pain, and Dr. Weindorfer ordered a cervical x-ray.  (Id.)  The x-ray indicated mild narrowing of the C3-4 interspace.  (Tr. 290.)

Plaintiff next saw Dr. Weindorfer for chronic low back pain on August 1, 2006.  (Tr.

---

[1]  "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  *Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")).  A GAF score of 51-60 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning; a score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  DSM-IV-TR 32.

287-88.) Dr. Weindorfer noted Plaintiff was maintained on narcotics by Dr. Quinn. (Tr. 287.) Plaintiff reported being depressed but not suicidal. (Id.) Upon physical examination, Plaintiff had full range of motion of the neck, no radicular symptoms, and no spinal tenderness. (Id.) Dr. Weindorfer prescribed Effexor for depression. (Id.)

Plaintiff saw Dr. Hobart on August 9, and was feeling much better after starting Effexor nine days earlier. (Tr. 293.) He also reported that he was probably going to have surgery and was feeling optimistic. (Id.) Plaintiff was not interested in pursuing counseling services. (Id.)

Plaintiff had another MRI on August 28, 2006. (Tr. 301, 308, 313.) Dr. Mark Stevens noted the MRI showed an extrusion of the disk at L5-S1 on the left and degenerative disk disease at L4-5. (Tr. 301.) Dr. Stevens spoke to Plaintiff about surgical options, stating that surgery might not help, and the MRI did not show anything life-threatening or neurologically threatening. (Id.) Dr. Stevens noted Plaintiff wished to have surgery anyway, because he had not improved by nonoperative means. (Id.) The surgery would involve anterior lumbar interbody fusion. (Id.)

On August 30, 2006, Plaintiff saw Dr. Susan Quinn at Franciscan Skemp Healthcare in follow up for low back pain. (Tr. 306-07.) Dr. Quinn noted Plaintiff was under a great deal of financial stress from not working. (Tr. 306.) He was depressed and his symptoms were bad enough that he wanted to have surgery. (Id.) He was looking for part-time work and also considering going to school in the future. (Id.)

Plaintiff's sleep had improved with Trazadone and hydrocodone. (Id.) His headaches were less frequent. (Id.) Moving his neck had been painful for the last five years, and he did not intend to return to truck driving. (Id.) Dr. Quinn continued Plaintiff's work restrictions of

twenty pound lift/carry, no driving while on opiate analgesics, and change position every sixty minutes. (Id.) She also referred Plaintiff for occupational therapy. (Tr. 307.)

The following medical records are dated after Plaintiff's amended onset of disability, September 1, 2006. In a preoperative report on September 13, 2006, Dr. Weindorfer noted Plaintiff's most recent MRI showed that "the L5-S1 seems to be putting a little more influence on the left S1 nerve root." (Tr. 304.) Plaintiff had L5-S1 interbody fusion without complications. (Tr. 517.)

On September 25, 2006, two weeks after his back surgery, Plaintiff had low back pain, cervical pain and headaches. (Tr. 532.) His pain increased with lying, sitting and moving but decreased with walking. (Id.) Plaintiff admitted to taking a lot of pain medication but nothing really helped. (Id.) Nurse Helen Lethlean at Franciscan Skemp Clinic noted:

> [he] is unable to slow his pacing down. He is a very kinetic person. He has even done laundry, however; it has been very light. His wife has tried to get him to stop it. He cannot sit still and never has been able to. He cannot even sit through a movie. He aches really bad into his back and hip areas. He has trouble sleeping because of it at night.

(Tr. 532)

Nurse Lethlean and Dr. Stevens spoke to Plaintiff by phone the next day about his pain. (Tr. 535.) Nurse Lethlean noted that Plaintiff had some form of undiagnosed ADD or ADHD and almost never sat still, and he had been like that all of his life. (Tr. 535.) She noted, "It would drive him crazy to decrease his activity, lay around and walk 4 to 6 times a day only." (Id.) Thus, he was more active than he should have been after surgery. (Id.) Dr. Stevens prescribed Baclofen, Wellbutrin and a Fentanyl patch. (Id.)

By October 11, Plaintiff was feeling a little better, and cutting down on his pain

medication.  (Tr. 536.)  Plaintiff reported that he might go back to school for retraining, because truck driving was very hard on his back, especially with clutching.  (Id.)  Plaintiff was also having daily headaches with neck pain.  (Id.)  He had tried many treatments, with only temporary relief.  (Id.)

On October 3, 2006, state agency consultant Dr. Russel Ludeke completed a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment regarding Plaintiff at the request of the Social Security Administration.  (Tr. 318-31, 332-35.)  Dr. Ludeke opined that Plaintiff did not meet or equal a listed mental impairment.  (Tr. 318-29.)  He further opined that Plaintiff would have the following residual functional capacity:  routine, repetitive tasks, three and four step, uncomplicated instructions, moderate difficulty with detailed instructions and marked difficulty with complex instructions; brief and superficial contact with others; and ability to handle stress would be adequate to tolerate the routine stressors of routine, repetitive, three and four step work.  (Tr. 334.)

Plaintiff saw Dr. Weindorfer about refilling his prescription for Effexor on November 6, 2006.  (Tr. 539.)  Plaintiff believed the Effexor was helping his depression.  (Id.)  Dr. Weindorfer noted Plaintiff was very focused on his pain, and he refused Plaintiff's request for an additional narcotics prescription.  (Id.)  Dr. Weindorfer told Plaintiff to increase his Trazadone at night to help him sleep.  (Id.)

Plaintiff saw Nurse Lethlean on December 1, 2006, and reported that he was having mostly bad days but was trying to keep a good attitude.  (Tr. 543.)  Plaintiff admitted he was pain-free for an hour that day when he drove to the clinic.  (Id.)  Plaintiff stated that myotherapy and walking seemed to help his pain, but he still had daily low back, leg, and neck pain and

headaches.  (Id.)  Dr. Stevens gave Plaintiff a medical release from work due to his surgery and the pain medications he was taking.  (Tr. 545.)

Dr. Hobart referred Plaintiff to Sally Sibbald, who saw Plaintiff for a psychological evaluation on December 27, 2006.  (Tr. 499-501.)  Ms. Sibbald noted there were concerns about Plaintiff's prescriptions for narcotic pain medications, because he admitted to a history of substance abuse.  (Tr. 499-500.)  Plaintiff's mental status examination was normal, with the exception that he appeared somewhat depressed.  (Tr. 501.)  Plaintiff was advised to abstain from all substances of abuse while on narcotic pain medications.  (Id.)

Dr. Weindorfer referred Plaintiff to Dr. Russell Gelfman at Mayo Clinic.  (Tr. 387.)  On January 8, 2007, Plaintiff's symptoms were pain, numbness of the left hand and leg, trouble with memory and concentration, loss of appetite, poor sleep, and feeling poorly overall.  (Id.)  On examination, Plaintiff moved around the office with some pain behaviors.  (Tr. 388.)  His mental status, gait, strength, reflexes and sensation were normal.  (Id.)  He had splinted range of motion of the spine with some mild discomfort of the cervical spine.  (Tr. 389.)

Dr. Gelfman diagnosed mechanical neck and low back pain and history of treatment for polysubstance dependence.  (Id.)  He opined that pain management was the only long-term option, and Plaintiff was not a candidate for long term opioid analgesics, given his history of polysubstance dependence.  (Id.)  He prescribed Gabapentin and referred Plaintiff to a pain rehabilitation center.  (Id.)

Several weeks later, Plaintiff saw Nurse Michele Evans at Mayo Clinic's Pain Rehabilitation Center.  (Tr. 391-93.)  Plaintiff reported headaches, neck and back pain, with only one hour in a day where he felt good.  (Tr. 391.)  Plaintiff said he could not manage his

responsibilities at home, and he was less sociable and more irritable.  (Id.)  At times he used a cane, and without hydrocodone, he had trouble getting out of bed.  (Id.)  He described his pain as constant but variable in intensity.  (Id.)

Upon examination, Plaintiff exhibited pain behaviors of position changes and grimacing. (Tr. 392.)  His mental status was normal, and he rated his mood as five or six on a scale of ten, where ten was the best possible mood.  (Id.)  Nurse Evans determined Plaintiff was an excellent candidate for the three week pain rehabilitation program.  (Tr. 393.)

Plaintiff saw Dr. Stevens at the end of January 2007.  (Tr. 552.)  Dr. Stevens reviewed Plaintiff's recent MRI and noted that it looked very good.  (Id.)  Dr. Stevens opined that further surgery was not indicated.  (Id.)  He also told Plaintiff it was his opinion that Plaintiff should expect between a 10-20% disability in his workers compensation claim.  (Id.)  Dr. Stevens recommended a pain program, and also offered to set up a functional capacity evaluation.  (Id.)

On February 1, 2007, Dr. Stevens responded to a letter from Plaintiff's attorney, which included a series of questions about his opinion regarding Plaintiff's injury.  (Tr. 553.)  Dr. Stevens stated, "[t]hus far, even despite the surgery that was performed on September 13, 2006, he has still not improved, and indeed, he says he feels that he is getting worse during our recent visit.  Although I have no objective evidence to suggest so, one can only go by the patient's complaints."  (Id.)  In response to whether Plaintiff's low back problem was caused by his work accident on June 23, 2007, Dr. Stevens stated the MRIs were not strikingly dramatic and discograms failed to prove the pain was a diskogenic problem, nonetheless; it would appear that the low back problems started after the work accident.  (Id.)  Dr. Stevens also opined that Plaintiff had reached a plateau in healing from the injury and surgery, and he could provide a

general framework of Plaintiff's work restrictions, but if a more objective evaluation was required, he would strongly recommend a physical functional capacity evaluation. (Tr. 554.) Dr. Stevens opined he would give Plaintiff a 20% permanent disability. (Id.) When asked his opinion of Plaintiff's work restrictions, Dr. Stevens stated:

> I would strongly recommend a more sedentary type of job where the patient is using his upper extremities and his mind rather than any strong physical labor . . .with weight restrictions of no more than 50 pounds . . .three times a day. The ideal position would allow him to be able to get up and move around with his needs and his back pain. In addition, he would probably need to lie down periodically and rest. It may also be required some sort of pain management through medication as well.

(Tr. 554.) Dr. Stevens also opined Plaintiff would probably require care for his low back pain for the rest of his life, including physical therapy, chiropractic treatment, and medication management. (Tr. 554-55.)

Plaintiff saw Dr. Weindorfer in follow up in March 2007, with numerous pain and numbness complaints, and trouble sleeping. (Tr. 557.) Plaintiff asked for a sleep aid and a work excuse, which Dr. Weindorfer provided. (Id.) When Plaintiff returned in May, Dr. Weindorfer reviewed Plaintiff's recent treatment and evaluation for nasal congestion and difficulty breathing, and he diagnosed reactive airway disease, likely asthma. (Tr. 565-66.)

On June 5, 2007, Plaintiff saw Dr. Weindorfer, who was soon to relocate, so he requested that Dr. Merfeld take over his primary care. (Tr. 570, 573.) Plaintiff sought a referral for physical and occupational therapy, and noted that he had a workers compensation proceeding and a disability proceeding coming up. (Tr. 570.) Dr. Weindorfer completed an Occupational Health Services Medical Release for Work form for Plaintiff. (Tr. 570.) He indicated that Plaintiff would have the following permanent restrictions: rarely lift and carry twenty pounds;

rarely force push-pull, rarely stand, walk, kneel, squat, climb, stoop, reach horizontal or overhead, and grasp left/right; and occasionally sit, stand, walk or drive; avoid frequent upward gaze; avoid frequent prolonged reach with elbows away from the body; avoid frequent prolonged bending and twisting at the waist; avoid any frequent prolonged reach above shoulder height; avoid ladders, unsupported heights and heavy machinery; avoid sitting/standing/walking more than fifteen to thirty minutes without position change. (Tr. 571.)

On June 19, 2007, Plaintiff underwent a physical therapy assessment with Physical Therapist Julie Olson. (Tr. 573-74.) Plaintiff's goal was to be able to attend a pain clinic that would require him to function for twelve hours. (Id.) Plaintiff was given home exercises to practice. (Tr. 573-74.) Ms. Olson indicated they would try to accomplish Plaintiff's goals in eight to twelve physical therapy sessions. (Id.)

Plaintiff also met with Dr. John Merfeld that day to establish primary care. (Tr. 575.) Plaintiff reported being frustrated with his "breakthrough" pain. (Id.) Dr. Merfeld recommended a retrial of Neurontin (Gabapentin) in addition to Plaintiff's other medications. (Id.) Dr. Merfeld's goal was to get Plaintiff feeling well enough to attend a pain program. (Tr. 575-76.)

Plaintiff had an EMG on June 29, 2007, to test for carpal tunnel syndrome. (Tr. 578.) There was no evidence for carpal tunnel syndrome, neuropathy or radiculopathy. (Id.)

Plaintiff underwent another independent medical evaluation with Dr. Paul Liebert on July 17, 2007. (Tr. 361-73.) Dr. Liebert reviewed Plaintiff's subsequent treatment since his last evaluation. (Tr. 362-63.) He described Plaintiff's pain profile as follows. Plaintiff reported no improvement in his back and leg pain after surgery. (Tr. 370.) He rated his pain as six on a

scale of one to ten.  (Id.)  His pain was constant, with a pinching sensation from his lower back into his left leg.  (Id.)  The pinching sensation was not related to any activity or position of his back.  (Id.)

Upon examination, Plaintiff was unable to sit for any length of time in the interview, and repeatedly got up and down from his chair due to low back pain.  (Tr. 370.)  He constantly demonstrated abnormal posturing and splinting behavior.  (Id.)  He had mild reversal of lordosis in the lumbar spine, and mild spasm with range of motion.  (Id.)  His forward flexion was eighty degrees with mild reversal of normal rhythm coming to an erect posture.  (Tr. 370-71.)  He could side bend and rotate at the trunk but reported mild mid low back pain at the extremes of motion with mild spasm.  (Tr. 371.)  The following tests were unremarkable:  sitting and supine provocative root tests, FABER and Milgram's tests, sensation, deep tendon reflexes, muscle strength of the lower extremities, heel to toe gait, toe and heel raising, and Waddell's responses.  (Id.)

Dr. Liebert opined that Plaintiff sustained a strictly soft tissue injury of his lower back on June 23, 2005.  (Id.)  Dr. Liebert stated, "his examination findings today are consistent with his recent surgery although he remains neurologically intact without deficit."  (Tr. 372.)  Dr. Liebert opined Plaintiff would have permanent work restrictions from his single level fusion of no frequent bending and limited to lifting over fifty pounds on an occasional basis.  (Id.)  He rated Plaintiff as having a 12% permanent partial disability.  (Tr. 373.)

Plaintiff followed up with Dr. Merfeld on July 22, and reported that the Fentanyl patch made him more functional.  (Tr. 582.)  Nevertheless, Plaintiff sought additional pain pills, but

Dr. Merfeld declined.  (<u>Id.</u>)  Dr. Merfeld increased Plaintiff's Fentanyl patch and his Neurontin. (<u>Id.</u>)

Plaintiff underwent a vocational consultation with Richard Armstrong on July 23, 2007. (Tr. 376-84.)  Mr. Armstrong reviewed Plaintiff's medical records.  (Tr. 376-78.)  He then summarized Plaintiff's subjective complaints.  (Tr. 379.)  Plaintiff reported pain in his lower back radiating down his left leg.  (<u>Id.</u>)  Plaintiff also complained of decreased concentration and memory, and he reported numbness in his hands since at least early 2007.  (Tr. 380.)  He was using a cane for walking.  (Tr. 379.)  Plaintiff said he could lift ten to twenty pounds on a nonfrequent basis.  (<u>Id.</u>)  He could sit and stand at thirty minute intervals maximum.  (<u>Id.</u>) Between 8:00 a.m. and 8:00 p.m., Plaintiff would lie down for five hours.  (<u>Id.</u>)  Plaintiff's daily activities included listening to the radio, watching television, occasionally cooking and caring for his sons, reading or using the Internet, taking his children to school, which he was capable of 80% of the time, and occasionally cleaning the bathroom.  (Tr. 379-80.)  Plaintiff reported recently having his home remodeled to put a shower on the first floor, put platforms under the washer and dryer, and install taller toilets.  (Tr. 380.)

Mr. Armstrong tested Plaintiff's IQ, and his score was 104.  (Tr. 381.)  Ignoring the need to lie down, but otherwise accepting Dr. Stevens' functional capacity analysis, Mr. Armstrong opined Plaintiff could perform jobs such as security guard, cashier, customer service representative, order clerk, and manufacturing jobs.  (Tr. 383.)  If he assumed Dr. Weindorfer's medical opinions, Armstrong opined that Plaintiff could perform jobs as an order clerk, customer service representative and telemarketer.  (Tr. 384.)  Assuming Dr. Liebert's medical opinions, Armstrong opined Plaintiff could return to work with a medium work classification.  (<u>Id.</u>)

Plaintiff saw Dr. Gelfman again on July 30, 2007. (Tr. 400-01.) Dr. Gelfman noted Plaintiff had changed his primary care to Dr. Merfeld, who was restarting Plaintiff on Gabapentin after he stopped taking it due to side effects. (Tr. 400.) Plaintiff had cut down to five tablets of hydrocodone a day, and reported being "super-depressed" until a Fentanyl patch was added. (Id.) Plaintiff was also taking Ambien and Effexor. (Id.)

On examination, Plaintiff's mood was upbeat but his speech was somewhat rapid. (Id.) He had some limitations of cervical motion due to pain, but he could sit, stand and ambulate without limitation. (Id.) His upper extremity strength was normal, and finger sensation was normal. (Id.) Dr. Gelfman remained concerned about Plaintiff's chronic opioid use and supported restarting Plaintiff on Gabapentin. (Id.) About a month later, Plaintiff told Dr. Merfeld his medications were not really helping him. (Tr. 584.)

Plaintiff underwent a series of evaluations to determine whether he would be a good candidate for Mayo Clinic's pain program. Plaintiff saw Physical Therapist John Postier for an initial assessment on September 26, 2007. (Tr. 402-04.) Plaintiff's worst pain was in the central low back, with some radicular pain in the left leg. (Id.) He also had radicular numbness in the hands. (Id.) Carpal tunnel testing was negative. (Id.) Plaintiff had headaches from cervical pain. (Id.) His pain level was seven on a scale of one to ten, and his pain behaviors included grimacing, anxiety, and moving often. (Tr. 403). Plaintiff was also assessed in occupational therapy that day. (Tr. 405-08). He stated that walking was the best thing for him. (Tr. 406.) He had trouble getting out of bed and getting dressed. (Id.) He no longer did as much driving or grocery shopping. (Id.) He didn't do as many things with his children. (Id.)

The next day, Plaintiff underwent a sleep study, which indicated sleep disordered

breathing.  (Tr. 426.)  Plaintiff also underwent a psychosocial evaluation with Nurse Patricia Anderson.  (Tr. 427-28.)  Plaintiff reported he could enjoy some of his hobbies, which included motorcycling, yard work and reading.  (Tr. 428.)

Dr. H.M. Hooten recommended that Plaintiff participate in an intensive pain rehabilitation program based on his review of Plaintiff's medical records, health screening, functional status, assessments of the multidisciplinary team, and his interview with Plaintiff. (Tr. 432.)  Plaintiff's prioritized problem list for the program was as follows:  1) activities of daily living; 2) physical deconditioning; 3) medication management; and 4) emotional distress. (Id.)  Plaintiff was admitted into the program on September 26, 2007.  (Tr. 442.)

On September 28, Plaintiff independently discontinued use of Vicodin.  (Tr. 433.)  He also started to taper his Fentanyl patch.  (Id.)  On October 1, Plaintiff reported to Nurse Joan Cronin that he had a history of substance abuse, and he consumed alcohol over the weekend. (Tr. 447).  He asked for help with his substance use problems.  (Id.)

On October 3, 2007, Plaintiff had symptoms of depression and opioid withdrawal.  (Tr. 434.)  He had not slept and insisted on going home to sleep.  (Id.)  The next day, Plaintiff underwent a psychological assessment with Psychologist Barbara Bruce.  (Tr. 453-54.)  She assessed Plaintiff's intelligence using the Wechsler Abbreviated Scale of Intelligence, and the results indicated average intelligence.  (Tr. 454.)  Plaintiff's academic skills were tested using the Wide Range Achievement Test-III, and he scored in the average range for attention and concentration.  (Id.)  On a Depression Scale, Plaintiff endorsed moderate depressive symptoms. (Id.)  On a Pain Catastrophizing Scale, Plaintiff reported his pain severity as moderate.  (Id.)

Plaintiff was discharged from the pain program on October 18, 2007.  (Tr. 479.)  Dr.

Jeffrey Rome noted the following progress in each of Plaintiff's problem areas. In activities of daily living, Plaintiff attended daily programming and decreased his pain behaviors. (Tr. 480.) Plaintiff had rated his pain, mood and sleep on a daily basis, and his pain averaged four on a scale of one to ten; his mood averaged six on a scale of one to ten (with ten being best mood); and he slept an average of four or five hours per night. (Tr. 481.) Despite pain, Plaintiff demonstrated the ability to attend eight hours of programming. (Id.)

In the area of physical deconditioning, Plaintiff showed improvement in endurance, strength, flexibility and overall aerobic conditioning. (Id.) Plaintiff developed plans for a consistent daily exercise routine. (Id.) He discontinued the following medications while in the program: hydrocodone, Fentanyl patch, Ambien, Naprosen and Effexor. (Id.)

In the area of mood management, Plaintiff expressed hope of normalizing his lifestyle with increased activity and improved coping skills. (Id.) Plaintiff was strongly encouraged to attend cognitive behavioral therapy after discharge. (Id.)

After completing the pain program, Plaintiff saw Dr. Merfeld on October 22, 2007. (Tr. 586.) Plaintiff reported he was off his medications and dealing with his pain by retraining his mind. (Id.) Plaintiff planned to attend a six-month vocational rehabilitation plan, and hoped to be employed in the near future. (Id.) Plaintiff was still having chronic headaches with vertigo, and requested physical therapy. (Id.) Plaintiff appeared well on examination. (Id.)

On November 6, Plaintiff was evaluated by Physical Therapist Kimberly Whitford. (Tr. 588-89.) Plaintiff complained of headaches and imbalance when he went from standing still to moving. (Tr. 588.) On examination, Plaintiff's gait and cervical range of motion were within normal limits. (Id.) All other tests were negative with the exception of some increased path

deviation and ataxia associated with head movements with ambulation.  (Id.)  Ms. Whitford offered Plaintiff vestibular and balance therapy to improve his sense of imbalance with quick motions.  (Id.) Plaintiff did not go through with the therapy.  (Tr. 591.)

Plaintiff saw Dr. Hobart on December 3, 2007, to review the results of his recent psychological evaluation.  (Tr. 504.)  Plaintiff demonstrated significant depression and anxiety on his Pain Patient Profile.  (Id.)  Dr. Hobart noted that Plaintiff's follow-through after the Mayo Clinic pain program was slipping away, because he was not performing his conditioning exercises, not structuring his day, and was more irritable and attending to his pain rather than using distraction and relaxation.  (Id.)  Plaintiff rated his chronic back pain at a level of five or six out of ten.  (Id.)

Plaintiff focused on his depression and irritability.  (Id.)  Dr. Hobart noted Plaintiff's depression and anxiety were at the level they were before Plaintiff's participation in the pain program.  (Id.)  Plaintiff agreed to continue counseling.  (Id.)

As an addendum to Dr. Hobart's psychological evaluation, Ms. Sibbald noted she saw Plaintiff the next day, and they discussed his continued occasional use of marijuana and alcohol.  (Tr. 505.)  However, Plaintiff was proud of taking himself off narcotic pain medication.  (Id.)  Ms. Sibbald noted Plaintiff would only return if necessary.  (Id.)

On December 17, Plaintiff reported feeling very irritated with his family.  (Tr. 506).  He also said that he signed up for some classes that allowed him to do some online work from home.  (Id.)  Dr. Hobart noted Plaintiff would be seeing Dr. Merfeld to get started on Cymbalta.  (Id.)

When Plaintiff saw Dr. Hobart again in January 2008, he was taking three classes and doing well.  (Tr. 507.)  He was also volunteering at a church theater on the weekends.  (Id.)  Dr.

Hobart noted, "these activities take his mind off his pain and allow him to function more appropriately." (Id.) Plaintiff's pain was generally at a level of three or four out of ten, and infrequently as high as seven or eight. (Id.)

Plaintiff saw Dr. Merfeld on January 28, and reported that Cymbalta was not yet helping his depression or pain. (Tr. 592.) Plaintiff was off all narcotic medication, and taking Naprosyn as needed. (Id.) He was taking classes, and planned to get his teaching degree. (Id.) Plaintiff appeared well on examination. (Id.)

When Plaintiff returned to see Dr. Merfeld in March 2008, he still did not feel any benefits from Cymbalta. (Tr. 596.) Dr. Merfeld increased the dose. (Id.) Plaintiff continued to take Naprosyn for headaches every other day. (Id.)

Plaintiff saw Dr. Stevens again on May 5, 2008. (Tr. 599.) Dr. Stevens reviewed Plaintiff's most recent MRI, and noted that there was nothing to explain bilateral upper extremity weakness and numbness. (Id.) Dr. Stevens doubted the cause was carpal tunnel syndrome because EMG results were normal, but noted there was a small chance of carpal tunnel with a negative EMG. (Id.)

Plaintiff also saw Dr. Merfeld that day and complained of severe pain, which he rated as five on a scale of one to ten. (Tr. 601.) Plaintiff had taken himself off Cymbalta, because it was not helping. (Id.) He reported that his pain increased with minimal activity. (Id.) He was having daily headaches, and suffering emotionally from chronic pain. (Id.) Plaintiff's back pain was predominantly in the cervical spine and upper back. (Id.) Dr. Merfeld suspected a "fibromyalgia variant." (Id.) He started Plaintiff on Lyrica. (Id.) Dr. Merfeld declined to prescribe narcotics after Plaintiff had worked so hard to get off narcotics. (Id.)

When Plaintiff saw Dr. Merfeld again in July, he asked for additional pain relief, although he noted some benefits from Lyrica. (Tr. 604.) Dr. Merfeld noted Plaintiff was trying to be more functional and was still attending school. (Id.) He declined to prescribe additional pain medication. (Id.)

On February 5, 2009, Dr. Hobart completed a "Medical Source Statement" form regarding Plaintiff's mental impairments. (Tr. 607-11.) Dr. Hobart indicated that Plaintiff's diagnoses were adjustment disorder, depressed mood, narcissistic personality disorder, and chronic pain disorder with a GAF score of 65. (Tr. 607.) Dr. Hobart noted that Plaintiff's clinical findings were chronic pain leading to dysphoric mood, irritability, decreased energy, occasional low motivation, and sleep disturbance. (Tr. 608.) He opined that Plaintiff's chronic pain disorder would cause him to miss three or more days of work per month. (Id.) He also indicated that independent of alcohol or drug addiction, Plaintiff's mental impairments would cause a moderate loss in his basic mental activities, but he could still perform mental activities from 1/3 to 2/3 of a normal eight hour workday. (Id.) Dr. Hobart indicated Plaintiff would have a moderate limitations in the ability to accept instructions, respond appropriately to criticism from supervisors; respond appropriately to changes in the work routine; activities of daily living; and one or two episodes of decompensation in a work-like setting. (Tr. 610-11.)

On February 25, 2009, Robert Czarnomski of Rehabilitation Services, a Minnesota agency, wrote a letter stating that Plaintiff was eligible for and participating in a vocational rehabilitation plan. (Tr. 649.) Plaintiff was taking part-time classes to become an elementary school teacher. (Id.) If Plaintiff did not improve to where he was able to work full-time, he planned to substitute teach. (Id.)

On March 30, 2009, Dr. Merfeld completed a Medical Source Statement form regarding Plaintiff's physical impairments. (Tr. 613-19.) Dr. Merfeld listed Plaintiff's symptoms as numbness of both hands, intermittent numbness of the feet, and chronic pain in the neck, upper and lower back. (Id.) He indicated that objective findings of Plaintiff's symptoms included decreased range of motion of the neck and low back, reduced grip strength, tenderness and muscle weakness. (Id.) He also opined that emotional factors affected the severity of Plaintiff's symptoms. (Tr. 614.) He opined that Plaintiff's pain was often severe enough to interfere with his attention and concentration, and Plaintiff was moderately limited in dealing with work stress. (Id.) Dr. Merfeld assigned Plaintiff the following physical limitations: sit one hour before alternating posture; sit for a total of four hours in a work day; stand or walk less than three hours before alternating posture; stand or walk for a total of six hours in a work day. (Tr. 614-15.) Dr. Merfeld indicated that Plaintiff would need to lie down during the day, but could do so during a scheduled morning break, lunch break and afternoon break. (Tr. 616.)

Dr. Merfeld also submitted Plaintiff's Functional Capacity Evaluation Report from an evaluation performed on January 6 and 9, 2009. (Tr. 634-48.) On a scale of one to five, with one meaning "able," three meaning "restricted," and five meaning "unable"; Plaintiff scored a five in the following activities: lift 100# crate; dig with shovel; lower 100# crate. (Tr. 647.) Plaintiff scored a four in the following activities: lift and lower 50# crate; carry 30# bucket, carry 20# bucket up step ladder; lift 50# tool box. (Id.) Plaintiff scored three in most other activities and did not score one in any activity. (Id.)

## B.    THE HEARING RECORD

Plaintiff and his wife testified at the hearing before the ALJ. Plaintiff testified that he

recently started attending college courses, nine credits in the spring and six credits in the summer. (Tr. 43-44.) He stated that the classes were in the evenings for three hours. (Tr. 44.) Plaintiff testified that he could not work, because he has back and neck pain during the day, and he has to lie flat. (Tr. 45.) He said he could walk a couple of blocks, stand less than fifteen minutes, and sit for 45 minutes to an hour. (Tr. 45.) He said he could lift ten pounds, maybe up to twenty pounds. (Tr. 46.) Plaintiff testified he could no longer go out dancing or ride a motorcycle or snowmobile. (Tr. 47-48.) He has a hard time writing or typing due to numbness in his hands. (Tr. 48.) His hands also get numb while driving, but he can drive 45 minutes to an hour. (Tr. 50.) Plaintiff also testified that pain caused him depression, but it was fatigue, not depression, that would interfere with his ability to work. (Tr. 52.)

Plaintiff testified that he lies down a couple of hours a day. (Id.) He also said sometimes he is in bed all day and night. (Tr. 53.) The ALJ asked how that could be, if he was going to school. (Id.) Plaintiff later explained that he will lie flat for three to six hours a day for pain relief, and lying down was his only relief. (Tr. 66-69.) He also explained that his situation varies a lot. (Tr. 67-68.) Plaintiff said he was fatigued during the day, and his medications might be partly to blame. (Tr. 55.)

The ALJ asked Plaintiff why could he not work, if he could attend the Mayo pain program all day. (Tr. 57.) Plaintiff testified there were many variables, but he did not think he could work all day without lying flat. (Id.) He stated that his pain did not improve after the Mayo pain program, he just learned to live with it. (Tr. 58.)

Plaintiff then testified about his daily activities. (Tr. 60.) His wife got up and got the kids ready for school, and he usually slept until 8:30. (Id.) He did some homework in the

morning, and did what he could around the house, including loading the dishwasher and getting the garbage ready for his son to take out.  (Id.)  One of his sons helped with a lot of chores.  (Tr. 60-61.)  Plaintiff did some of the lawn mowing.  (Tr. 61.)  Plaintiff also did a little shopping and cooking, but his wife did most of it.  (Tr. 63-64.)  Plaintiff had volunteered at a church theater where he supervised children while they watched a movie.  (Tr. 62-63.)  Plaintiff testified that he rode his motorcycle once that year.  (Tr. 73.)  With respect to his future, Plaintiff said he hoped to substitute teach, but he did not think he would be able to teach full-time.  (Tr. 72.)

Plaintiff's wife testified that Plaintiff doesn't do nearly as much as he used to.  (Tr. 75.)  She did most of the housework.  (Tr. 75.)  At most, Plaintiff assisted his son doing something for an hour and a half.  (Tr. 75.)  She testified that if Plaintiff overdid his activities, he would be in tears and lay in bed the rest of the night.  (Tr. 78.)

Dr. Andrew Steiner[2] testified at the hearing as a medical expert.  (Tr. 78.)  Dr. Steiner gave his opinion that Plaintiff could lift ten pounds frequently and twenty pounds occasionally; is limited to occasional bending, twisting, stooping, kneeling, crawling, crouching, power gripping and overhead work; and can't work in high concentrations of fumes, dust or other pollutants.  (Tr. 81.)  Dr. Steiner also stated that Plaintiff might be limited from commercial driving, if it required him to sit for long periods.  (Tr. 84.)

Mr. Edward Utities[3] testified at the hearing as a vocational expert.  (Tr. 37, 85.)  The ALJ asked Mr. Utities whether someone with the following characteristics could perform any of

---

[2]     According to the resume of the medical expert, his last name was Steiner, not Snyder, as he is identified in the transcript of the hearing before the ALJ.  (Tr. 131.)

[3]     According to the vocational expert's resume, his last name is Utities, not Titus, as he is identified in the transcript of the hearing before the ALJ.  (Tr. 132.)

Plaintiff's past relevant work: Plaintiff's age, education and work experience, with the physical restrictions described by Dr. Steiner, and additional restrictions to routine, repetitive, unskilled work, brief and superficial contact with others, and stress no greater than what is usually associated with routine, repetitive work. (Tr. 89-90.) Mr. Utities testified that such a person could not perform Plaintiff's past relevant work but could perform other work in the national economy including a variety of bench work assembly jobs. (Tr. 90-91.) Mr. Utities further testified that these jobs would allow a person to change positions every thirty minutes, and many allowed a sit/stand option. (Tr. 91.) He testified that a person could not perform these jobs if he had to lie down for an hour after an hour of activity, and employers would not tolerate absenteeism of three or more days a week. (Id.) Mr. Utities stated that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), with the exception of his discussion of a sit/stand option, which was based on his professional experience. (Tr. 92.)

## C.   THE ALJ'S DECISION

In dismissing Plaintiff's claims for disability benefits, the ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since October 14, 2005. (20 CFR 404.1520(b), 404.1571 *et seq.*)
>
> 3. The claimant has the following severe impairments: severe degenerative disc disease of the lumbar spine with subsequent discectomy and fusion; one level degenerative disc disease of the cervical spine; headaches; obesity; asthma; obstructive sleep apnea; depression; anxiety; chronic pain syndrome; and a history of substance and alcohol abuse. (20 CFR 404.1521 *et seq.*).
>
> 4. The claimant does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR 404.1525 and 404.1526.)

5. After careful consideration of the entire record, including the credible testimony of the impartial medical expert, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) as lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking 6 hours of an 8 hour day, allowing for a change of position after 30 minutes of sitting, limited to no more than occasional bending, twisting, stooping, kneeling, crouching, crawling, climbing, and power gripping, avoiding overhead work and exposure to high concentrations of pollutants, and further limited to routine, repetitive unskilled work with no more than brief and superficial contacts with others and a level of stress no greater than typically associated with routine, repetitive work.

6. After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

7. The claimant is unable to perform any past relevant work. (20 CFR 404.1565).

8. The claimant was born on May 16,1969, and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563).[4]

9. The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

---

[4]     Plaintiff was 37 years-old on his amended onset date of September 1, 2006.

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (20 CFR 404.1569 and 404.1569a).

12. The claimant has not been under a disability, as defined in the Social Security Act, from October 14, 2005 through the date of this decision.  (20 CFR 404.1520(g)).

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).  In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  Moore ex rel Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).

### B.  New evidence submitted to the Appeals Council

Plaintiff submitted new evidence to the Appeals Council, including the February 29, 2009 letter from Robert Czarnomski (Tr. 649); the February 5, 2009 Medical Source Statement from Dr. James Hobart (Tr. 607-11); and the Medical Source Statement from Dr. John Merfeld (Tr. 613-26).  Although the Appeals Council claimed to have reviewed the new evidence and

determined it did not provide a basis for changing the ALJ's decision, Plaintiff questions whether the Appeals Council actually reviewed the evidence. Plaintiff points out that Dr. Merfeld's Medical Source Statement was signed and dated, but the Appeals Council said it was unsigned and undated. Plaintiff also notes the Appeals Council decision is dated July 4, 2009, a day when federal offices were closed.

Although the Appeals Council was incorrect in stating Dr. Merfeld's Medical Source Statement was unsigned and undated, this mistake does not indicate that the Appeals Council failed to review the evidence, nor does the date on the decision. When the Appeals Council considers new and material evidence but declines review, as it did here, the ALJ's decision becomes the final decision of the Commissioner. Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995). The reviewing court's task is only to determine whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence reviewed by the Appeals Council but not before the ALJ. Id. Therefore, this Court will address Plaintiff's arguments based on the evidence in the record including the evidence submitted to the Appeals Council.

### C.     Evaluation of Plaintiff's Credibility

Plaintiff contends the ALJ erred in discounting his credibility, especially with respect to his testimony that he must lie down several hours a day due to pain. Particularly, Plaintiff contends remand is necessary because the ALJ mischaracterized Dr. Stevens' statement that Plaintiff would "probably" need to periodically lie down and rest, instead; stating Dr. Stevens opined Plaintiff would "possibly" need to periodically lie down. Plaintiff also asserts the ALJ is incorrect in stating there is no objective evidence to support Plaintiff's complaints because

Plaintiff had back surgery based on his MRI findings. Plaintiff suggests a patient would not take the risks of surgery if not in pain, and a doctor would not perform the surgery if there was no cause for it.

Plaintiff also contends the ALJ mischaracterized his daily activities as involving a wide range of household chores. Plaintiff asserts the evidence shows that he only does what he can, and his wife and children help out. Plaintiff cites the following cases as nearly identical to his testimony about his daily activities: Leckenby v. Apfel, 487 F.3d 626, 634 (8th Cir. 2007); Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005).

Finally, Plaintiff contends the ALJ improperly speculated that Plaintiff was receiving vocational rehabilitation services because he intended to return to work full-time, when he testified that he only intended to substitute teach when he could.

Defendant, on the other hand, asserts that substantial evidence supports the ALJ's decision to discount Plaintiff's credibility, in part due to the lack of objective findings. Defendants cites numerous examinations where Plaintiff had normal range of motion, normal neurological findings, normal strength, mild MRI findings, and normal EMG tests. Defendant also contends that Plaintiff's condition improved with treatment, especially from the Mayo Clinic pain program. Defendant contends that an impairment that can be controlled by treatment is not disabling.

In evaluating the credibility of a claimant's subjective complaints, the ALJ must consider evidence such as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984). The ALJ may discredit subjective complaints when they are inconsistent with the evidence as a whole. Id. But the ALJ must detail his reasons for discrediting the testimony. Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

First, the ALJ did not commit reversible error by finding Dr. Stevens indicated Plaintiff would possibly, as opposed to probably, need to lie down during the day for pain relief. Dr. Stevens explained that the objective findings did not indicate a reason for Plaintiff's continued severe pain but, as a treating physician, he had to accept Plaintiff's pain complaints, and his opinion of Plaintiff's work restrictions was offered on that basis. (Tr. 553.) An ALJ need not accept a treating physician's RFC opinion if it is based on the claimant's entirely subjective complaints. See Chapman v. Barnhart, 87 Fed.Appx. 598, 600 (8th Cir. 2004) (ALJ not required to accept physician's RFC opinion where reported symptoms were entirely subjective). As discussed below, the record does not support a finding that Plaintiff would probably need to lie down during the day. Therefore, it is immaterial whether Dr. Stevens said Plaintiff would "possibly" or "probably" need to lie down during the day.

Second, there are other reasons to discredit Plaintiff's subjective complaint of his need to lie down for pain relief. First, Plaintiff worked despite his neck pain and headaches for years after his 1999 neck injury and there is no evidence that this condition worsened. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) (discrediting claimant where he worked for years after injury without evidence of deterioration of his condition). Second, when Plaintiff first injured his lower back in June 2005, and again after his back surgery, he reported that walking, not lying down, provided some relief for his back pain. (Tr. 532, 406.) In fact, after his back surgery, Plaintiff stated that lying down *increased* his pain. (Tr. 532.) Furthermore, Nurse

Lethlean noted that Plaintiff was overdoing his activity after surgery, because he had some form of undiagnosed ADD or ADHD and had never in his life been able to sit still for long, he couldn't even sit through a movie. (Tr. 535.) Plaintiff's wife said she could not get him to stop and rest. (Tr. 532.) Plaintiff said it would drive him crazy to lay around. (Id.) There is nothing in the record to explain how Plaintiff overcame this lifelong inability to sit still and was able to lie in bed for hours a day, when he could not do so shortly after having back surgery.

An ALJ can discount a claimant's credibility based in part on the lack of objective complaints, if there are other factors weighing against the claimant's credibility. Plaintiff's pain complaints and the possibility that his pain was caused by a bulging disc impinging on a nerve root provided a reason to do surgery, but does not necessarily support the severity of Plaintiff's subjective complaints after surgery and rehabilitation. MRIs after the surgery indicated a successful fusion. (Tr. 552, 599.) After surgery, Plaintiff's examinations were usually normal, with full range of motion, full strength, and no neurological problems. (Tr. 268-69, 288, 290, 345, 370-71, 388-89, 588, 599.) In other words, there were very minimal objective findings to explain Plaintiff's continued degree of pain.

The Court agrees that Plaintiff's ability to engage in limited household chores does not indicate that he has the ability to engage in full-time employment, as the Eighth Circuit found in Leckenby and Reed, supra. However, there is other evidence of Plaintiff's activities that suggest his pain is not as severe as to preclude all work. In addition to doing some household chores, Plaintiff attended a full-time pain program at Mayo Clinic. (Tr. 480-81.) Nothing in the Mayo Clinic records indicates Plaintiff had to lie down during the day while attending the full day rehabilitation program for three weeks. After completing the pain program, Plaintiff attended as

many as nine credit hours of classes in a semester and was successful in school.  (Tr. 507).
Although Plaintiff no longer does as much as he used to, the totality of his activities suggest his
physical and mental impairments do not preclude all work.

In summary, there is evidence in the record inconsistent with Plaintiff's testimony that he
must lie down during the day for pain relief.  The minimal objective findings and Plaintiff's
successful treatment at Mayo Clinic without prescription pain medication, where he had an
average pain level of four out of ten, but was able to attend programming all day, supports the
ALJ's credibility determination.  See Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000)
(impairments that were controlled by treatment were not disabling); Haynes v. Shalala, 26 F.3d
812, 814 (8th Cir. 1994) (finding failure to take substantial pain medication was inconsistent
with disabling pain).  And Plaintiff's participation in vocational rehabilitation with the goal of
becoming a teacher suggests he is not disabled from all work.  See Melton v. Apfel, 181 F.3d
939, 942 (8th Cir. 1999) (job search undermined claim of disability). There is substantial
evidence in the record to support the ALJ's decision to discount Plaintiff's subjective
complaints.

    **D.**       **Evaluation of the Physicians' Opinions**

Plaintiff contends the ALJ erred by granting more weight to the opinions of Dr. Steiner,
the medical expert, and Dr. Liebert, who was hired by an insurance company for Plaintiff's
workers compensation claim, than to his treating physicians.  Plaintiff concludes the ALJ erred
by not granting controlling weight to the opinions of Dr. Hobart and Dr. Weindorfer.  However,
Defendant asserts Plaintiff's treating physicians' opinions were inconsistent with evidence in the
record.

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record.  Leckenby, 487 F.3d at 632 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).  "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician."  Lehnartz v. Barnhart, 142 Fed. Appx. 939, 942 (8th Cir. 2005).  If the treating physician's opinion is not given controlling weight, the ALJ should consider the following factors:  examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability of opinion, consistency of opinion with record as a whole, specialization, or any other factors that support or contradict the opinion.  20 C.F.R. § 404.1527(d).  In this case, it is the supportability of the opinions and the consistency of the opinions with the record as a whole that weigh in favor of affirming the ALJ's evaluation of the physicians' opinions.

After his alleged onset date, Plaintiff saw Dr. Weindorfer on few occasions, and there were no objective findings to support his pain complaints with the exception that one would expect a period of post-surgical pain.  (Tr. 539, 557, 565, 570.)  The work restrictions Dr. Weindorfer assigned to Plaintiff on June 5, 2007, allowed Plaintiff to occasionally sit, stand, walk and drive.  (Tr. 570, 605.)  Occasionally was defined as 25 minutes to 2 and 2/3 hours a day.  (Id.)  These sitting, standing and walking limitations are greater than imposed by any other

physician. Dr. Weindorfer's treatment records indicate that he never imposed such restrictions on Plaintiff.

Dr. Weindorfer's opinion that Plaintiff was limited to rarely lifting and carrying twenty pounds was inconsistent with the findings of Plaintiff's functional capacity evaluation performed by Dr. Merfeld. Plaintiff scored three on a scale of one to five, where one meant "able" and five meant "unable" to lift and carry ten and twenty pounds. (Tr. 647.) A score in the middle range suggests that Plaintiff could perform the activity more than rarely. Furthermore, Dr. Stevens, who performed Plaintiff's back surgery, only restricted Plaintiff to lifting fifty pounds three times a day. (Tr. 554.)

Dr. Steiner's opinion, which is consistent with the minimal objective findings on examination by all of the physicians after Plaintiff's surgery, restricted Plaintiff to lifting and carrying ten pounds frequently, and twenty pounds occasionally. (Tr. 81.) Because the evidence in the record was inconsistent with Dr. Weindorfer's RFC opinion, the ALJ did not err in granting more weight to Dr. Steiner's opinion, which included greater restrictions than Dr. Liebert's July 2007 opinion. (Tr. 373, 554.)

The ALJ did not have the opportunity to review Dr. Merfeld's RFC opinion or Plaintiff's functional capacity evaluation because they were created after the administrative hearing. Dr. Merfeld limited Plaintiff to sitting less than six hours a day, and the ALJ found that Plaintiff could sit for a total of six hours a day. When the evidence in the record is considered as a whole, Dr. Merfeld's opinion would not have changed the ALJ's decision. After Plaintiff's alleged onset date, objective findings were minimal. Shortly after his surgery, on October 11, 2006, Plaintiff reported that he wanted to go to school for retraining, because truck driving was too

hard on his back. (Tr. 536.) Plaintiff was able to follow through with this by attending college classes, because he improved with treatment and was able to discontinue narcotic pain medications. This is inconsistent with Dr. Merfeld's opinion that Plaintiff cannot sit for six hours in an eight hour period, given the ability to change position every thirty minutes.

Plaintiff also contends the ALJ should have credited Dr. Hobart's opinion of Plaintiff's mental residual functional capacity. Dr. Hobart's Medical Source Statement was submitted to the Appeals Council after the administrative hearing, but the Court will consider whether it would have changed the ALJ's decision. Dr. Hobart found Plaintiff to have moderate limitations in mental activities of work, which the Court finds were adequately accommodated by the ALJ's restriction of Plaintiff to routine, repetitive, unskilled work with no more than brief and superficial contacts with others and a level of stress no greater than typically associated with routine, repetitive work.

However, Dr. Hobart also opined Plaintiff's chronic pain disorder would cause him to miss more than three days of work in a month. (Tr. 608.) Dr. Hobart's treatment records are inconsistent with his opinion. When Dr. Hobart first evaluated Plaintiff in July 2006, Plaintiff's GAF score was 55, indicating the middle range of moderate psychological limitations. (Tr. 295.) On his next visit, after beginning antidepressant medication, Plaintiff felt much better and declined counseling services. (Tr. 293.) In December 2006, another psychologist found Plaintiff's mental status to be normal, although he was "somewhat" depressed. (Tr. 501.) In December 2007, Plaintiff's depression increased to his pre-surgery level when he stopped following through with the strategies he learned in the Mayo Clinic pain program. (Tr. 504.) However, Plaintiff quickly improved. (Tr. 507.) When Dr. Hobart completed the medical

source statement in February 2009, he assigned Plaintiff a GAF score of 65, indicating only mild

psychological limitations.  (Tr. 607.)  Plaintiff's improvement from moderate to mild

psychological limitations is inconsistent with a person who would be unable to work three days

or more a month.  Therefore, Dr. Hobart's opinion would not have changed the ALJ's

determination that Plaintiff mental limitations would not preclude unskilled, routine, repetitive

work with brief and superficial contact with others and limited stress, consistent with the state

agency consultant, Dr. Ludeke's opinion.  (Tr. 334.)

   **E.**  **The Vocational Expert's testimony**

  In his Reply, Plaintiff asserts that there is no evidence in the record that a significant

number of jobs exist in the national economy that Plaintiff could perform.  The VE testified that

"many" of the bench assembly jobs he identified as consistent with Plaintiff's residual functional

capacity allowed a sit/stand option, and this information came from his professional experience

not from the DOT, which does not identify if a position would allow for a sit/stand option.  (Tr.

90-91.)  The VE identified 5,000 bench assembly jobs in the state of Minnesota that Plaintiff

could perform without distinguishing how many of those jobs allowed for a sit/stand option.

(Id.)  Plaintiff asserts remand is required, because the ALJ cannot rely on the VE testimony

because it conflicts with the DOT.

  The VE's testimony does not conflict with the DOT, the DOT simply doesn't address the

issue of a sit/stand option.  The real issue is whether the Commissioner satisfied its burden at

step five of the disability evaluation process.

  20 C.F.R. § 404.1560 provides:

> In order to support a finding that you are not disabled at this fifth
> step of the sequential evaluation process, we [the Social Security

Administration] are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.

The VE identified 5,000 bench assembly positions in the state of Minnesota that are consistent with light, repetitive unskilled jobs with limited stress and brief and superficial contact with others. (Tr. 90-91.) When the ALJ added the need to change positions from sitting to standing every hour, the VE testified it would not eliminate or reduce any of those jobs. (Tr. 91.) Then the ALJ altered the restriction to changing position every thirty minutes. (Tr. 91.) The VE testified, "I still think it would be possible. Many of those jobs offer sit/stand options where a person could stand or use a stool in terms of performing the function." (Tr. 91.)

Even if "many" of those jobs means only 10%, which is low given the VE's testimony that a sixty minute sit/stand option would not reduce any of the jobs, there would still be 500 jobs in the state of Minnesota that Plaintiff could perform. The Eighth Circuit Court of Appeals has found that 500 jobs in the region in which the claimant worked was a "significant number of jobs." Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988); see also Hall v. Chater, 109 F.3d 1255, 1259-60 (8th Cir. 1997) (less than 400 jobs were a significant number of jobs); Boyd v. Astrue, Civ. No. 08-785 (MJD/FLN), 2009 WL 1514505 at *12 (D.Minn. June 1, 2009) (citing Jenkins, 861 F.2d at 1087). Therefore, the Court finds that the VE's testimony satisfied the Commissioner's requirement to identify "other work that exists in significant numbers in the national economy" that Plaintiff could perform.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.     Plaintiff's Motion for Summary Judgment (#11) **be DENIED**;

2.     Defendant's Motion for Summary Judgment (#19) **be GRANTED**;

3.     The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**

DATED: December 1, 2010.

*S/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before December 15, 2010, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.